[Cite as *In re G.O.*, 2019-Ohio-4547.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF G.O | : | JUDGES: |
|  | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
|  | : | Hon. Earle E. Wise, J. |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | Case No. 2019CA0037 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING:     Civil appeal from the Licking County Court
                            of Common Pleas, Juvenile Division, Case
                            No. F2017-0629

JUDGMENT:                   Affirmed

DATE OF JUDGMENT ENTRY:     October 31, 2019

APPEARANCES:

For Licking County JFS                    For Jessica Ormsby

WILLIAM C. HAYES                          MICHAEL DALSANTO
Licking County Prosecutor                 33 West Main St., Ste. 109
By: MANDY R. deLEEUW                      Newark, OH 43055
Assistant Prosecutor
20 S. Second Street, 4th Floor            For G.O.
Newark, OH 43055                          ROBIN LYN GREEN
                                          P.O. Box 157
ELSHAAD PURYEAR                           Newark, OH 43058
104 ½ East Main Street
Newark, OH 43055                          Guardian Ad Litem
                                          MARY ELLEN LESLIE
                                          28 Keswick Drive
                                          New Albany, OH 43054

*Gwin, P.J.*

{¶1}    Appellant-mother appeals the May 10, 2019 Judgment Entry of the Licking County Court of Common Pleas, Juvenile Division, which overruled her objections, denied her motion for legal custody and terminated her parental rights with respect to her minor child, G.O. (b. Sept. 24, 2008) and granted permanent custody of the child to appellee, Licking County Department of Jobs and Family Services (hereinafter "LCJFS").

*Facts and Procedural History*

{¶2}    Paternal grandfather, J.O. obtained custody of G.O. on September 30, 2009 in Licking County Juvenile Court Case Number G 2009-0487.  In making this grant of custody, the trial court found that Appellant-mother was immature and impulsive, had abandoned G.O., likely had substance abuse issues, and had mental health issues.  The court ordered that there would be no visitation, contact, or communication permitted between Appellant-mother and G.O., but added,

> The [Appellant-mother] must first contact this Court and provide verification
>
> of her current living conditions, stability of her life, and appropriate home
>
> environment.

*In re: G.O.,* Licking County Court of Common Pleas, Juvenile Division, Case No. G2009-0487, filed Sept. 30, 2009 at 3 [State's Exhibit 4B].  That entry contains a handwritten notation on the last page stating, "No address for mom to send copy of entry."

{¶3}    In August of 2017, paternal grandfather approached Children Services seeking assistance.  He was having significant health issues, and felt he could no longer serve as the full-time parent for G.O.  On September 6, 2017, the State of Ohio filed a complaint alleging that G.O. was a dependent child.  A temporary orders hearing was

held that day, and the child was placed in the shelter care custody of LCJFS Services. On November 1, 2017, G.O. was found to be a dependent child, and was placed into the temporary custody of LCJFS. Appellant-mother did not appear for the adjudication. Subsequent to the adjudication, paternal grandfather passed away.

{¶4} On July 13, 2018, LCJFS filed a Motion for Permanent Custody. On October 1, 2018, Appellant-mother filed a motion for Legal Custody or an extension of time to continue working on her case plan. Both motions came on for an evidentiary hearing on February 1, 2019 and February 12, 2019.

*Permanent Custody / Legal Custody Trial*

{¶5} Appellant-mother testified that G.O. was not thriving in her care. Appellant-mother was told shortly after birth that the child's craniosynostosis was caused by mother's drinking while she was pregnant. 1T. at 73; 81. Appellant-mother gave guardianship of the child to her father. 1T. at 47.[1] Appellant-mother at first indicated that because the "county" thought she was unfit, she was not able to live with paternal grandfather and the child. 1T. at 47. She claimed, however, that he let her stay for a month and then he kicked her out. 1T at 47-48. She was homeless after that time and did not see the child. Appellant-mother was married from October 2008 until July 2009. 1T. at 105 - 106. She moved to Fort Drum, New York with her husband; however, she left after only two months, citing to violence by the man against her. She came back to Ohio and attempted to see G.O. but her father denied her request. She was aware at that time that a custody hearing had taken place and that her father

---

[1] For clarity, reference to the hearing that occurred on February 1, 2019 will be by volume and page number as "1T." and reference to the hearing that occurred on February 12, 2019 will be referred to by volume and page number as "2T."

was given custody of G.O. 1T. at 86. Appellant-mother testified she believed that her father had discretion concerning her visitation with the child, not the Juvenile Court. 1T. at 89. She did not attempt to contact the Court to determine her right to visitation.

{¶6}    In December 2009, Appellant-mother moved to California. She testified that while in California, she got herself clean and sober, participating in A.A. She went to college and earned an Associate's Degree. Prior to the filing of the complaint for permanent custody, Appellant-mother had not seen G.O. for five years. 1T. at 97.

{¶7}    In California, Appellant-mother lives in a townhouse. She shares that apartment with her mother P. O., her ex-fiancé, a male friend, and her son. Appellant-mother shares a bedroom with the male friend, though she stated that they are not in a relationship, nor do they share a bed. Her ex-fiancé has a room of his own, her mother has her own room, and her son has a room. Photos of parts of the townhome were submitted as evidence. When asked for details about who would live where should G.O. come to that home, Appellant-mother testified G.O. would share a bedroom with her brother, using the bunkbeds in that room. Monthly rent is $1,720.00. [Mother's Exhibit 3]. Mother testified that she is responsible for paying one-fourth the rent. 1T. at 62.

{¶8}    Appellant-mother testified that she works at a chicken restaurant called Kiki's Chicken. She testified that she works as a customer service employee. She is paid $12 an hour and works between 30 and 40 hours a week. She started in September 2018. Prior to that Pizza Hut had employed her; however she lost that job due to complaints by customers about her interactions with them. No more details or explanation was provided about this situation with Pizza Hut.

{¶9}    Appellant-mother was referred for a mental health assessment. She testified she has issues including being bi-polar, attention deficit disorder, obsessive-

compulsive disorder, and depression. An assessment was completed as part of her case plan. Her testimony was that she was told she needed no further services, but that she could return for counseling, as she felt was needed. Appellant-mother testified she had been prescribed medication for her mental health in the past, but stopped taking medication around 3 years ago. She testified that, while she was pursuing her college degree, she was taking Wellbutrin for anxiety, but stopped after graduating as she felt she had things under control. During cross-examination, Appellant-mother acknowledged having issues with manic depression, and telling the person doing her mental health assessment that she had just gone through an episode about a week before the assessment appointment. The assessment recommended a psychiatric evaluation, as medication would help with the issues. Appellant-mother testified that she does not like medication because of the way it makes her feel. She instead uses holistic approaches to address her mental health concerns, such as applying essential oils, listening to soothing music, and using "stones" to help. She demonstrated in court by pulling a small stone from her pocket, and showing that she rubs the stone when she feels stressed or anxious.

{¶10} Maternal grandmother P.O. testified that G.O. was born with complications. 1T. at 111. P.O. was living in California at the time. G.O. testified that Appellant-mother moved to California in 2010 when she was pregnant with her son. 1T. at 112-113. P.O. testified that she became aware in August 2013 that the child G.O. was in California. 1T. at 114. P.O. testified that the child was in California from February 2013 until July 2013. 1T. at 114. P.O. testified that she filed for custody of G.O. in California. 1T. at 114. P.O. testified that Appellant-mother did not file the motion for custody; however, she wrote the court a letter stating that she, Appellant-mother, could not care for G.O. 1T. at

134. G.O. testified that Appellant-mother had given P.O. guardianship of P.O. 1T. at 134. P.O. testified that because G.O. had left California, the court could not go forward with her motion. P.O. further testified that she never filed a motion for custody in Ohio claiming,

> No, because we were told that - - from [J.O.] that we were - - we had no contact, we had absolutely no information regarding her. What we understood is [J.O.] had full custody and [Appellant-mother] didn't - - didn't have anything.

1T. at 115. P.O. further testified that in California in 2013, she overheard J.O. ask Appellant-mother to relinquish her parental rights to G.O. to her sister. 1T. at 148-149. She testified that J.O. told Appellant-mother "We have the papers. All we need for you to do was sign them." 1T.at 149.

{¶11} P.O. further testified that in 2018, she told the ongoing caseworker Allison Keeley that Appellant-mother would never be able to handle raising G.O. on her own. 1T. at 157.

{¶12} Prior to the filing of the motion for permanent custody, P.O. had not seen G.O. since 2013. 1T. at 119. P.O. did not file a motion for legal custody of G.O.

{¶13} Testimony was presented that G.O. is a child with special needs. Caseworker Keeley testified that when G.O. came into care, it was reported that she was an autistic child. Given this information, G.O. was scheduled for testing and services through an autism program at Nationwide Children's Hospital. The testing took place over several months from October 2017 until February 2018, when autism was ruled out as a basis for the child's observed delays and behaviors. Genetic testing was recommended to look for a genetic disorder. This was done in March of 2018, and no genetic disorders were detected. A cognitive testing was recommended next, which took place in April 2018, and several delays were confirmed. It was recommended that "brain mapping" be done to determine the best ways in which to work with G.O. to address these delays. This brain mapping was done in May 2018. The results came back in June 2018. The foster mother was taught some

parent/child interactive therapy techniques, but in August 2018, more formal counseling was determined to be necessary. In September 2018, G.O. was put on the wait list for counseling, and in November 2018, G.O. started counseling. She started out doing bi-weekly sessions. After she became comfortable with the counselor and the sessions, the frequency of sessions was increased to weekly sessions.

{¶14} The result of these assessments and testing appear to conclude that G.O. is suffering from cognitive issues resulting from early childhood trauma, and she is now participating in trauma-based counseling. She is also engaged in occupational therapy, physical therapy, and speech therapy to work on her developmental delays in order to help her catch up. She has an I.E.P[2] at school, which addresses these delays, and her educational needs are being addressed through that plan.

{¶15} G.O. is in foster care. After removal from paternal grandfather, G.O. was placed with an aunt, but was removed from that placement shortly after due to physical abuse by that aunt. She is now placed in the home of T. B.

{¶16} T.B. testified during the permanent custody/legal custody trial. This is the first child that T.B. has fostered. T.B. has a degree in Early Childhood Development, and previously had been an STNA.[3] T.B. testified about G.O. and her experiences with her. She has observed a great deal of change in G.O. When G.O. came into her home, she described her as a quiet and timid child, who was frightened by loud noises, even the vacuum cleaner. Having been in her home now since September 2017, G.O. has become much more outgoing and expressive. Noises do not cause the fear reaction in G.O. any longer. T.B. testified that as a part of the counseling, she charts G.O.'s behaviors by noting things on a calendar, with the assistance of the staff at school. This information

---

[2] Individualized Education Program.
[3] State tested Nursing Assistant

is provided to the counselor so that sessions can meet the needs presented. T.B. testified that G.O. has good days and bad days, and that she does not know what G.O. she is going to get each day until she wakes her in the morning. She described some days when G.O. acts as a much younger child, almost like a toddler in terms of her behavior, her communication, and her interactions with others. On other days, G.O. acts much more like her chronological age. She described life with G.O. as being busy. There are weekly counseling sessions, occasional meetings at school to address G.O.'s needs, in addition to the required I.E.P., meetings and conferences.

{¶17} T.B. was asked about the video chats. She verified that only two chats occurred, both during the bi-weekly "visits" G.O. has with her cousins. On both occasions, T.B. was present in the area, and listened in so that she would know of any issue or problems. She said each lasted about ten minutes, and G.O. appeared confused about what was going on. After each video chat, G.O. expressed concerns about being made to leave T.B.'s home. After the actual visit with Appellant-mother that took place on January 31, 2019, T.B. described significant behavioral issues. For the three days following the visit, G.O. played with her feces after using the restroom. She drew on her bedding and the walls in her room. G.O. threw tantrums for several days after the visit, throwing herself down on the floor and screaming about not leaving. G.O. talked incessantly about someone coming to take her away from T.B.'s home. T.B. also described what she believes to be seizures, which she has observed in G.O. during some behavioral issues.

{¶18} There is no home study of Appellant-mother's home. There is no approval of that placement from the State of California. Caseworker Keeley was asked why no home study was requested from California. Caseworker Keeley stated that no home study was requested because Appellant-mother did not begin engaging with Children Services until the permanent custody motion was filed. No motion was filed with the trial court prior to the conclusion of the permanent custody trial

and the filing of the Magistrates opinion asking that a home study be ordered under the Interstate Compact for the Placement of Children (Revised Code 5103.20).  *Magistrate's Decision,* filed Mar. 13, 2019 at 10.

{¶19}   The GAL has noted, "G.O., due to her disabilities, lacks the wisdom and maturity to make her wishes known."

{¶20}   After the presentation of evidence, the attorney advocate for G.O. stated her support for the state's motion for permanent custody.  2T. at 282-285.  The GAL recommended that the child be placed in the legal custody of Appellant-mother, or in the custody of P.O. in California.

{¶21}   The trial court concluded LCJFS has made reasonable efforts to prevent the need for continued removal in this case.

{¶22}  The court further found,

> For clarity, there is no motion before the court asking that legal custody of [G.O.] be granted to [P.O.] There was no Statement of Understanding presented to the undersigned signed by [P.O.] as required in Revised Code 2151.353(A)(3).  As such, [P.O.] is not an option that can be considered.

*Magistrate's Decision,* filed Mar. 13, 2019 at 12.  The court further stated that

> It does not find that a placement in the California home is in the best interests of [G.O.].  [Appellant-mother] is living in a four bedroom home with three other adults and her son.  Two of these adults are males, and are complete strangers to [G.O.].  The two people in this home who know [G.O.] best are [Appellant-mother] and [P.O.], who have spent a combined total of less than five hours with [G.O.] in the last two years, and less than

a day with her since [G.O.] was placed with her grandfather back in 2009. So, essentially, the plan proposed would be to pack up [G.O.] and send her across country to a home with four people she barely knows. [Appellant-mother] has some mental health issues, which she addresses with essential oils, music, and worry stones (small rocks she rubs with her hands while stressed). She refuses medication, and goes to counseling when she needs it, like when she feels overwhelmed. [Appellant-mother] did take medication when she was in college, as she was concerned about going to school full-time with the added stresses of work and parenting. Bottom line is that the home that [Appellant-mother] offers is one filled with people who [G.O.] doesn't know, in a place she doesn't know. Additionally, [G.O.] has some special needs which are being addressed through trauma counseling, but which is also manifesting itself through behavioral issues. There was a great deal of discussion as to why these issues weren't brought to light sooner and why [G.O.] wasn't involved in counseling for quite some time after the case began, As was explained, [G.O.] was involved in a great deal of diagnostic services which appear to have taken many months to complete. These services were necessary to determine what [G.O.'s] needs are, so that the treatment could be tailored to her needs. With this all said, the undersigned heard nothing about what [Appellant-mother] has available in California to work with [G.O.] and her needs. She and [the G.A.L.] kept harping on the delay in sharing [G.O.] diagnosis with [Appellant-mother], but no one offered the undersigned any

idea of what services are available in California.  Given that the Motion for Legal Custody is asking for immediate placement, the undersigned cannot simply take a "wait and see" approach to this.  That is not in [G.O.'s] best interests.  Simply put, the undersigned finds that the evidence presented did not establish that a placement in California, with either [Appellant-mother] or [P.O.], is in [G.O.'s] best interests.

*Magistrate's Decision,* filed Mar. 13, 2019 at 13-14.

{¶23}  By Judgment Entry filed May 10, 2019, the trial court held,

The Court has undertaken an independent examination of the magistrate's decision and has reviewed the entire transcript of the proceeding including all exhibits admitted into evidence at hearing.  This Court can find no errors of law or other defects prejudicial to the rights of the parents or the child.  This Court finds that the record contains substantial, credible evidence which supports the magistrate's findings as set forth in his decision.

{¶24}  On March 13, 2019, the same date that the Magistrate's opinion was filed[4], Appellant-mother filed a motion to commence an Interstate Compact on the Placement of Children pursuant to R.C. 5103.23[5].  Appellant-mother asked the court order LCJFS commence and cooperate with the receiving state, California for potential placement of G.O. with Appellant-mother.

{¶25}  By Judgment Entry filed April 4, 2019 the trial court denied the motion on the ground that the motion was not timely filed, having been filed after

---

[4] The Magistrate's Decision bears a time-stamp of 12:39 p.m.
[5] The motion bears a time-stamp of 1:11 p.m.

permanent custody had been granted and that compact is not required if the Agency does not plan to place the child out-of-state.

{¶26} Appellant-mother filed her notice of appeal with this Court on May 24, 2019.

*Assignments of Error*

{¶27}  Mother raises two assignments of error.

{¶28}  "I. THE TRIAL COURT ERRED IN FINDING THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY.

{¶29}  "II. THE AGENCY FAILED TO MAKE REASONABLE EFFORTS IN REUNIFYING THE CHILD BECAUSE IT REFUSED TO CONDUCT AN INTERSTATE COMPACT STUDY OF THE APPELLANT'S HOME IN CALIFORNIA."

**BURDEN OF PROOF.**

{¶30}  "[T]he right to raise a child is an 'essential' and 'basic' civil right."  *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972).  A parent's interest in the care, custody and management of his or her child is "fundamental."  Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982).  The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case."  In re *Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991).  Therefore, parents "must be afforded every procedural and substantive protection the law allows."  Id.

{¶31}  An award of permanent custody must be based upon clear and convincing evidence.  R.C. 2151.414(B)(1).  The Ohio Supreme Court has defined "clear and

convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

**STANDARD OF APPELLATE REVIEW.**

**{¶32}** The Ohio Supreme Court has delineated our standard of review as follows,

> Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. See *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526, *Cole v. McClure*, 88 Ohio St. 1, 102 N.E. 264, and *Frate v. Rimenik,* 115 Ohio St. 11, 152 N.E. 14.

*Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E. 2d 118 (1954). A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

**{¶33}** In *Cross*, the Supreme Court further cautioned,

> The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the

impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.* See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added).

***Requirements for Permanent Custody Awards***

**{¶34}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶35}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one

or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶36} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

### 1. Parental Placement within a Reasonable Time–R.C. 2151.414(B)(1)(a).

{¶37} In her second assignment of error, Appellant-mother contends that LCJFS failed to make reasonable efforts in reunification because the agency refused to conduct an Interstate Compact study of Appellant-mother's home in California pursuant to R.C. 5103.20.

{¶38} The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151 .414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *See In re William S.*, 75 Ohio St.3d 95, 1996–Ohio–182, 661 N.E .2d 738; *In re Hurlow*, 4th Dist. Gallia No. 98 CA 6, 1997 WL 701328 (Sept. 21, 1998); *In re Butcher*, 4th Dist. Athens No. 1470, 1991 WL 62145(Apr. 10, 1991).

{¶39} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

> (E) In determining at a hearing held pursuant to division (A) of this
> section or for the purposes of division (A)(4) of section 2151.353 of the
> Revised Code whether a child cannot be placed with either parent within a

reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

* * *

(16) Any other factor the court considers relevant.

{¶40} R.C. 2151.414(D) requires the trial court to consider all relevant factors in determining whether the child's best interests would be served by granting the permanent

custody motion.  These factors include but are not limited to: (1) the interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) apply.

{¶41}  In this case, the trial court made its permanent custody findings pursuant to R.C. 2151.414(E)(1), (4) and/or (16).

{¶42}  As set forth above, the trial court's findings are based upon competent credible evidence.  The trial court was in the best position to determine the credibility of the witnesses.

**The Interstate Compact on the Placement of Children ("ICPC")**

{¶43}  The ICPC is a contract among member states and U.S. territories authorizing them to work together to ensure that children who are placed across state lines for foster care or adoption receive adequate protection and support services.  See R.C. 5103.20, Article I, Section (A)-(C).  This is accomplished by ensuring that if a child is moved across state lines, that child's rights be protected as if they were in their home state and all legal requirements are observed.  The compact characterizes states as either "sending" or "receiving."  The sending agency/state is a member state that sends, brings, or causes to be sent or brought any child to another member state.  Id. at Article II, Section (T).  The receiving state is the state to which the child is sent, brought, or caused to be sent or brought for placement with state or local public authorities, or for placement with private agencies or persons.  Id. at Article II, Section (P).  The ICPC states that jurisdiction is vested in the sending state "over a child with respect to all matters of

custody and disposition of the child which it would have had if the child had remained in the sending state. Such jurisdiction shall also include the power to order the return of the child to the sending state." Id. at Article IV, Section (A). *In re: G.M.*, 8th Dist. Cuyahoga No. 95410, 2011-Ohio-4090, ¶6.

{¶44} The trial court noted that Appellant-mother did not file a motion with the trial court requesting that the court order an ICPC until after the permanent custody trial and after the Magistrate's decision had been filed. By Judgment Entry filed April 4, 2019 the trial court denied the motion on the ground that the motion was not timely filed, having been filed after permanent custody had been granted and that compact is not required if the Agency does not plan to place the child out-of-state.

{¶45} Any failure of LCJFS to request an ICPC study is harmless beyond a reasonable doubt because the results of the case would not have changed.

{¶46} The record establishes by clear and convincing evidence, that Paternal Grandfather, J.O., was given legal custody of G.O. due to Appellant-mother's alcohol and drug abuse. The Judgment Entry giving Paternal Grandfather custody clearly prohibits Appellant-mother from visitation or contact with G.O. until Appellant-mother provided verification of her current living conditions, stability of her life, and appropriate home environment. At no time during her visits to Ohio did Appellant-mother ever attempt to contact the Licking County Juvenile Court to determine how she could obtain visitation and/or custody of G.O. Instead, Appellant-mother chooses to rely upon her fear of her father to excuse her lack of effort. No testimony was presented that Paternal Grandfather had ever abused Appellant-mother. The only reason given by Appellant-mother for her fear is that Paternal Grandfather could somehow take her son away from her. The

evidence establishes that Appellant-mother knew that she retained some parental rights to G.O. She even wrote a letter to the California court in support of her mother P.O. obtaining custody of G.O. The record clearly establishes that Appellant-mother could have, but did not seek custody or visitation of G.O in the Licking County Court of Common Pleas, Juvenile Division at any time before the permanent custody motion was filed.

{¶47} In 2013, Appellant-mother admitted to the California court that she was unable to care for G.O. P.O. further testified that in 2018, she told the ongoing caseworker Allison Keeley that Appellant-mother would never be able to handle raising G.O. on her own. 1T. at 157.

{¶48} The case of *In re: Secrest*, 2nd Dist. Montgomery No. 19377, 2002-Ohio-7096 cited by Appellant-mother is distinguishable. In the case at bar, there was no evidence presented that California would accept a transfer of the case. *In re: R.M.,* 2nd Dist. Montgomery No. 27318, 2017-Ohio-4325, ¶49. Further, there was no evidence presented that G.O. is bonded to Appellant-mother. *In re: R.M.,* 2017-Ohio-4325, ¶50. The evidence established that Paternal Grandfather was given custody on September 30, 2009. Appellant-mother moved to California in 2010. Appellant-mother did not seek transfer at the time she moved to California, as did the mother in *Secrest*. *In re: R.M.,* 2017-Ohio-4325, ¶51.

{¶49} During the time that she lost custody and the time she returned to California, Appellant-mother had no face-to-face or telephone contact with G.O. Appellant-mother did not contact the court or an attorney in Ohio to determine her rights.

{¶50} Between 2010 when she moved to California and 2013, Appellant-mother saw G.O. one time in 2013 when G.O. was in California. From that visit in 2013 until the permanent custody trial, Appellant-mother had at most two in-person visits and two video

visits.  Appellant-mother did not even attend the second day of the permanent custody trial on February 12, 2019.  2T. at 202-203.  Appellant-mother returned to California due to her employment at the chicken restaurant.

{¶51} In this case, referrals were made for Appellant-mother by LCJFS for substance abuse assessments, mental health assessments, housing and employment services, parenting education, and visitation.  Arrangements were made for video chats between Appellant-mother and G.O.  The record establishes that only two such chats occurred.  Appellant-mother testified that she told no one at LCJFS about problems with facilitating or scheduling the video chats.

{¶52}  "Reasonable efforts" have been described as the state's efforts to resolve a threat to a child's health or safety before removing the child from the home or permitting the child to return home, which follow an intervention to protect a child from abuse or neglect.  *See In re C.F.*, 113 Ohio St. 3d 73, 862 N.E. 2d 816, 2007– Ohio– 1104, at ¶ 28, *citing* Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation* (2003), 12 B.U. Pub.Int.L.J. 259, 260.  These efforts are required because of the fundamental nature of the right to parent one's children.  *In re C.F.,* 2007– Ohio– 1104, at ¶ 21, 113 Ohio St. 3d 73, 862 N.E. 2d 816.

{¶53}  The Ohio Supreme Court has held that the trial court is not obligated by R.C. 2151.419 to make a determination that the agency used reasonable efforts to reunify the family at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing.  *See In re C.F.,* 2007–Ohio– 104, at ¶ 41; ¶ 43; See*, also*, R.C. 2151.419.  The trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family

at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.*, 2007– Ohio– 1104, at ¶ 41.

{¶54} A parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification. The ultimate question under R.C. 2151.414(A)(1) is whether the parent has substantially remedied the conditions that caused the child's removal. *In re Shchigelski* (Oct. 20, 2000), 11th Dist. No. 99–G–2241, 2000 Ohio App. LEXIS 4900, 2000 WL 1568388; *In re McKenzie* (Oct. 18, 1995), 9th Dist. No. 95CA0015, 1995 Ohio App. LEXIS 4618, 1995 WL 608285. A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed—the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency. *In re J.L.,* 8th Dist. No. 84368, 2004–Ohio–6024, at ¶ 20; *In re Mraz*, 12th Dist. Nos. CA2002–05–011, CA2002–07–014, 2002–Ohio–7278.

*In re C.C.*, 187 Ohio App.3d 365, 2010–Ohio–780, 932 N.E.2d 360, ¶ 25 (8th Dist.).

{¶55} In the case at bar, evidence was presented that G.O. has unique needs. Each day waking up, T.B. testified that she did not know which version of G.O. she will get, meaning that G.O.'s behaviors, and the demands on a parent to address those behaviors, will vary every day. T.B. described life with G.O. as being busy, between counseling sessions, meetings at school, conferences and doctor appointments. As she described it, G.O. is a child who needs a parent who is on her "A" game every day.

{¶56} Appellant-mother presented no evidence that she is capable of meeting G.O.'s special needs. Other than making arrangements for G.O. to have a bedroom with either her brother or her grandmother, Appellant-mother did not present the trial court with any plan concerning how she would cope with G.O. on a day-to-day basis. The evidence is clear that Appellant-mother has a problem with stress but does not seek or follow the advice of professionals to deal with the issue. No evidence was presented as to how Appellant-mother would arrange for G.O. to receive I.E.P. plans, counseling and doctor appointments.

{¶57} In short, clear and convincing evidence supports the trial court's finding that LCJFS made reasonable efforts at reunification. Although LCJFS could have made a referral for an ICPC, the record establishes by clear and convincing evidence that Appellant-mother could not manage the complex and special needs of G.O.

### *The Best Interest of the Child.*

{¶58} In her First Assignment of Error, Appellant-mother argues that the trial court erred in finding it to be in the best interest of G.O. to grant the motion for permanent custody.

{¶59} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need

for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶60} The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424(8th Dist.1994). A finding that it is in the best interest of a child to terminate the parental rights of one parent is not dependent upon the court making a similar finding with respect to the other parent. The trial court would necessarily make a separate determination concerning the best interest of the child with respect to the rights of the mother and the rights of the father.

{¶61} The trial court made findings of fact regarding G.O.'s best interest. It is well-established that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re: Mauzy Children*, 5th Dist. Stark No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), *quoting In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424(8th Dist. 1994).

{¶62} As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* 5th Dist. Stark No. CA-5758, 1981 WL 6321(Feb. 10, 1982). "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that

cannot be conveyed to us through the written record, *Miller v. Miller*, 37 Ohio St. 3d 71, 523 N.E.2d 846(1988).

{¶63} In the present case, the trial court's decision indicates it considered the best interest factors. Upon review of the record, it is clear that the record supports the trial court's finding that granting the motion for permanent custody is in G.O.s' best interest. The trial court concluded the child's need for legally secure placement could not be achieved without awarding permanent custody to LCJFS.

{¶64} G.O. has now been in her foster home since September 7, 2017. Appellant-mother had little contact with G.O. since losing custody to the Paternal-Grandfather in 2009. G.O. displayed disruptive and destructive behavior at the thought of being sent to California. She not only regressed in her behaviors but also had seizures. G.O. appears happy and making progress in her current environment. G.O.'s basic and special needs are being meet in her present home. It appears that the foster parent is loving and supportive of G.O. G.O. will need care supervision, and support for many years to come.

### *Conclusion*

{¶65} For these reasons, we find that the trial court's determination that Appellant-Mother had failed to remedy the issues that caused the initial removal and therefore the child could not be placed with her within a reasonable time or should not be placed with her was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence. We further find that under the facts of this case, any failure to conduct an ICPC study of Appellant-mother's home in California was harmless beyond a reasonable doubt.

{¶66} We further find that the trial court's decision that permanent custody to LCJFS was in the child's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶67} Because the evidence in the record supports the trial court's judgment, we overrule Appellant-Mother's two assignments of error, and affirm the decision of the Licking County Court of Common Pleas, Juvenile Division.


By Gwin, P.J.,

Hoffman, J., and

Wise Earle, J., concur